United States District Court
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                                          No. C 07-01138 CW

10   ADOLFO MENDOZA; AZUCENA MENDOZA;
     A.M., Jr., a minor; R.M., a minor;     ORDER GRANTING
11   and E.M., a minor, by and through      DEFENDANTS CRANE,
     their guardian ad litem, Adolfo        SERRANO, GIL-BLANCO,
12   Mendoza; and JHONNY MENDOZA,           DORAN, MIRIANI,
                                            REPOSA, AND
13             Plaintiffs,                  STEPHENS' MOTION FOR
                                            SUMMARY JUDGMENT AND
14        v.                                DENYING DEFENDANT
                                            STEPHENS' SEPARATE
15   SCOTT WHITEHOUSE, FRED DORAN, MIKE     MOTION FOR SUMMARY
     WOOD, JIM MAYORAL, STEVE MIRIANI,      JUDGMENT
16   JORGE GIL-BLANCO, ALDO SERRANO, STEVE
     CRANE, JOE REPOSA, JOHNATHAN
17   STEPHENS, and DOES 4 through 50,

18             Defendants.
     _____/
19

20        Defendants Stephen Crane, Aldo Serrano, Jorge Gil-Blanco, Fred

21   Doran, Steve Miriani, Joe Reposa and Jonathan Stephens have filed a

22   motion for summary judgment.  Defendant Stephens has also filed a

23   separate motion for summary judgment on an excessive force claim

24   against him.  Plaintiffs oppose the motions.  The motions were

25   heard on August 14, 2008.  Having considered all the papers filed

26   by the parties and oral argument on the motions, the Court grants

27   Defendants' motion for summary judgment and denies Defendant

28   Stephens' separate motion.

BACKGROUND

As discussed in the Court's earlier orders, this action arises from an operation involving officers from several law enforcement agencies that resulted in the forced entry by officers into Plaintiffs' home at 41 DiMaggio Avenue in Pittsburgh, California. Plaintiffs' home was misidentified in a search warrant as the home of a suspect involved in a narcotics investigation conducted by an intergovernmental joint narcotics task force called the Solano County Narcotics Enforcement Team (Sol-NET) and the Vacaville Police Department (VPD).

The moving Defendants are (1) Fred Doran, a special agent supervisor with the California Department of Justice, Bureau of Narcotics Enforcement, who was the Sol-NET commander at the time of events underlying this case; (2) Jorge Gil-Blanco, a detective with the Dixon Police Department; (3) Aldo Serrano, a detective with the Benicia Police Department; (4) Stephen Crane, a detective with the Fairfield Police Department; (5) Steve Miriani, an officer with the California Highway Patrol; (6) Joseph Reposa, a sergeant with the Pittsburgh Police Department (PPD); and (7) Jonathan Stephens, an officer with the PPD. The non-moving Defendants are (8) Mike Wood, a sergeant with the Vacaville Police Department (VPD) and member of Sol-Net; and (9) Scott Whitehouse, a detective with the VPD.[1]

In March, 2005, VPD and Sol-NET were conducting a joint investigation of a suspected drug dealer named James Higgins who

---

[1]Plaintiffs settled their claims against Defendant James Mayoral, a sergeant with VPD and supervisor of the other VPD officers.

United States District Court
For the Northern District of California

lived in Fairfield.  On March 22, 2005, at approximately 7:30 PM, VPD and Sol-NET began monitoring Higgins' home in Fairfield. Several officers were involved in the surveillance, each driving his own car.  A few hours after the surveillance began, Higgins and a woman left his home and drove away in a Mitsubishi car.  The officers began following Higgins, but lost sight of him.  Based on prior information, Wood believed that "Higgins was likely to go to somewhere in Contra Costa [County], possibly the Pittsburg[h] or the Antioch Area."  Wood Depo. at 31.  Wood was able to locate Higgins' Mitsubishi on a nearby highway and followed it to a residential neighborhood in Pittsburgh.  At approximately 10:00 PM Wood observed Higgins and his companion park the car and enter a house on DiMaggio Avenue.  None of the other officers was present.

Whitehouse arrived about twenty minutes later, while Higgins and his companion were still inside the house.  Communicating by radio, Wood had described the house as a "small, wood-framed house, stucco exterior.  U-Haul truck appeared to be parked directly in front of it.  Other vehicles on the roadway or on the curb line, the east curb line."  Id. at 38.  Wood also told Whitehouse that there was a car underneath a cloth car cover parked in the driveway.  Id.  Whitehouse testified that, based on Wood's description, he was able to distinguish the target house from those around it without "any doubt in [his] mind."  Whiteouse Depo. at 33.  Whitehouse testified that from where he parked, he "had a clear line of sight" and "was looking at the front door for number 53 DiMaggio."  Id. at 35.

While Whitehouse and Wood were parked on DiMaggio Avenue,

3

**United States District Court**
For the Northern District of California

Miriani, Doran, Crane and Serrano went to the Rio Vista bridge, located between Pittsburgh and Fairfield, intending to intercept Higgins on his way back to Fairfield.  Gil-Blanco, Mayoral, Reposa and Stephens parked their cars on surrounding streets to establish a perimeter around the house Higgins had entered.

At approximately 10:30 PM, Whitehouse saw Higgins and his companion leave the house.  Higgins was carrying a large plastic bag.  Wood testified that he did not see the two suspects actually leave the house, but he saw them cross the street.  Wood and Whitehouse both testified that they saw Higgins put the plastic bag in the trunk of the Mitsubishi before driving away.  At about the same time, a maroon minivan pulled out of a nearby driveway and drove in the same direction Higgins had driven.  All of the officers in the area, except for Whitehouse, followed Higgins.  After three or four blocks, the maroon minivan went in a different direction from Higgins' car and the officers decided to follow Higgins.  The officers took note of the minivan because they were suspicious that it might be involved in counter-intelligence, that is, seeing whether the Mitsubishi was being followed.

Whitehouse initially remained in Pittsburgh to see if anybody else came out of the house on DiMaggio Avenue.  He later attempted to catch up to the officers pursuing Higgins, but was instructed by Wood to return to Pittsburgh to gather the information necessary to obtain a search warrant.  Whitehouse drove back to DiMaggio Avenue to obtain a description of the house to be used in the warrant application.  Whitehouse testified that he drove by the house that Higgins had visited "until [he] obtained the legal description" of

4

United States District Court
For the Northern District of California

the house necessary for the search warrant.  Whitehouse Depo. at 43.  This took two or three passes.  Whitehouse further testified, "At some point as I was driving past the residence I obtained the numbers[] 41."  Id. at 44.  He acknowledged that this was an error and that the target house was actually 53 DiMaggio Avenue.  Whitehouse also saw that the house Higgins had visited "had a yellow stucco exterior with white trim" and "red brick fascia."  Id.

While Whitehouse was preparing the search warrant, the other officers stopped Higgins' car on the Rio Vista bridge.  They searched the Mitsubishi and discovered a large quantity of methamphetamine and two handguns.  Wood called Whitehouse to inform him that drugs had been discovered in Higgins' vehicle.  Miriani questioned the woman who was with Higgins.  Miriani testified that she told him that she and Higgins "had gone to a house that contained a black male and a black juvenile."  Urhausen Decl., Ex. 5 (Miriani Depo.) at 21.

Whitehouse proceeded to the Pittsburgh Police Department to draft the search warrant.  While at the police department, Whitehouse conducted a records search and discovered that the house at 41 DiMaggio Avenue was owned by Plaintiff Adolfo Mendoza.  In the warrant, he described the property to be searched as follows:

> #41 Dimagio [sic], within the City of Pittsburgh, County of Contra Costa, California.  Further described as a single story single family residence with an attached garage.  The residence has a yellow, stucco exterior, with white trim.  Additionally the residence has a red brick facia [sic].  The numbers "41" are located on a hanging sign, and are visible from the street.  The front door to the residence faces north, and has a white, security screen door attached.

5

Whitehouse Depo., Ex. 3.

At approximately 11:45 PM, Wood instructed three VPD officers, including former Defendant Mayoral, to go to DiMaggio Avenue to maintain surveillance on the house.  Whitehouse Depo. at 52; Urhausen Decl., Ex. 10 (Mayoral Depo.) at 19.  Whitehouse testified that the three officers were watching 53 DiMaggio Avenue and that he described the house to them as having "yellow stucco exterior with white trim, brick in front of the house as well as the vehicle with the white cover on it in the driveway and then the silver U-Haul vehicle which was directly in front of the residence."  Whitehouse Depo. at 52.  Whitehouse also told them that the brick on the house was red.  Id.  Whitehouse did not state how he knew that Mayoral and the other two officers were looking at 53 DiMaggio rather than 41 DiMaggio.

At some time after he drafted the search warrant application but before the officers executed the warrant, Whitehouse rode in Reposa's car while Reposa drove down DiMaggio Avenue "to confirm the address and the legal description" of the target house.  Id. at 47.  Whitehouse testified that he "pointed out No. 53" but does not recall if Reposa responded.  Id.  Whitehouse further testified, "I think I described it as we were driving.  And then as we were driving I indicated okay, it's yellow stucco, it's got white trim, it's coming up here."  Id. at 47-48. Whitehouse testified that he did not check the house number again because he "was confident that [he] had identified the house number."  Id. at 48.

In addition, Wood rode in Gil-Blanco's car as he drove down

6

DiMaggio Avenue. At his deposition, Wood testified that he "attempted to try and inconspicuously look for numbers" but "never saw any numbers on either house." Wood Depo. at 53. He also identified a photograph of the house at 53 DiMaggio Avenue as "the house that [he] believed that Higgins would have left." Id.

At approximately 1:10 AM, Whitehouse telephoned a Solano County Superior Court judge to present the search warrant application. Whitehouse requested authority to execute the warrant immediately. The judge issued the search warrant and authorized immediate service.

Shortly after the warrant was issued, the officers gathered for a pre-search briefing at the VPD. All of the officers who participated in executing the warrant were present at the briefing except for the three officers who were watching DiMaggio Avenue. The briefing lasted for approximately fifteen to twenty minutes. Wood described the briefing as follows, "I had a portion of the briefing, just historically bringing everybody to the point where we landed at on DiMaggio. I brought everybody up to speed, how we arrived there and why." Wood Depo. at 60. Whitehouse describes his participation in the briefing as follows:

> Basically we described that we were conducting a search warrant at the residence. I provided the address of the residence in question. We would have gone into a very limited background of the investigation at this point. . . .
> And I believe at that point we indicated that there were weapons located when Mr. Higgins was stopped, which would lead us to believe that there's a higher-than-normal probability that there would be weapons at the location to be searched. . . . I drew a diagram of the residence that I had seen. And I indicated that that was No. 41 DiMaggio Drive. . . .
> I drew the front of the house . . . where the door

United States District Court
For the Northern District of California

7

**United States District Court**
For the Northern District of California

> faces, that the door faces north.  I drew where the
> vehicle with the white cover was in the driveway and
> approximately where the silver U-Haul was located on
> the street.

Whitehouse Depo. at 60-61.  Whitehouse testified that he does not

recall whether he stated that the target house had white trim or

red brick fascia.  Id. at 62.  However, when asked whether the

target house was described as a "yellow stucco house with a raised

red brick porch[, a] U-Haul parked directly in front and a vehicle

parked in the driveway with a cloth car cover," Wood answered,

"Yes."  Wood Depo. at 57.  Whitehouse also testified, "The

operational plan was that we would conduct a hard knock notice at

the residence . . .  Indicating that we would knock loudly on the

door, announce ourselves as police officers and wait for a response

as opposed to just knocking on the door and waiting for someone to

open it."   Whitehouse Depo. at 62-63.

When Whitehouse was finished with his portion of the briefing,

Wood gave the officers their individual assignments.  In particular

he stated,

> I placed agents in their positions, call it a stack.
> And [I] put agents in their positions, the point, the
> rear guard.  Any special tools or special weapons were
> assigned and put in a stack strategically.  The ram
> position is assigned.  There's a number of people that
> were never in the stacks so that we had a lot of folks
> involved.

Wood Depo. at 60.  Wood did not give the officers instructions

regarding what they should do after entering the house.  Instead

the group used "a dynamic entry approach," which he describes as "a

flow-like-water tactic" in which officers move quickly throughout

the house being searched.  Id. at 68.

8

**United States District Court**
For the Northern District of California

At approximately 1:30 AM, the entry team gathered around the corner from DiMaggio Avenue on North Parkside Drive before continuing on foot to 41 DiMaggio Avenue.  The officers did not pass 53 DiMaggio Avenue in route to 41 DiMaggio Avenue.  Several of the officers testified that it was very dark.  Whitehouse testified that, as the group approached 41 DiMaggio, there was no vehicle with a white car cover in the driveway, nor was there a U-Haul truck parked in front.  However, Whitehouse testified that he could see a vehicle with a white car cover in the driveway of the neighboring house, 53 DiMaggio.  In addition, a U-Haul truck was parked in front of that house.

Whitehouse testified that he had not looked up at the house numbers, so he was heading toward 53 DiMaggio, where the car and truck were parked.  However, as the group was walking past 41 DiMaggio, somebody pointed out that the maroon minivan they had seen earlier that day was parked in the driveway.  Whitehouse explained that "at that point I saw the vehicle and then I looked at the residence and saw the numbers 41 and believed that we were -- this was the house we were to be searching the search warrant at.  And at that point, I began walking up towards the front door of No. 41."  Id. at 71-72.  The other officers were following Whitehouse.  Id. at 72.

According to Doran, the house appeared to be white rather than yellow, but he noticed that the street lights cast a yellow tint on the house.  Doran testified that he noticed the brick fascia on the house, but "[i]t didn't occur to [him] that it wasn't red."  Urhausen Decl., Ex. 4 (Doran Depo.) at 39.  Doran also testified

that he could not recall whether he had been told that the fascia of the target house was red. Mayoral testified that, at the time of the search, he did not realize that the house the team was entering did not match the physical description of the house provided at the briefing. Mayoral also testified, "I thought I was going into the right house. During the briefing number 41 was mentioned. I did look up as we approached the house and I did see number 41." Urhausen Decl., Ex. 10 (Mayoral Depo.) at 82.

The team approached the front door of 41 DiMaggio Avenue and Whitehouse knocked loudly and yelled, "Police, search warrant, demand entry." Whitehouse Depo. at 75. When there was no response, Mayoral repeated the announcement in Spanish. After the announcement had been repeated three times in English and in Spanish, Wood instructed Serrano to use the battering ram to enter the house. Officer Whitehouse held open the security screen door while Serrano forced the door open.

The other officers, including moving Defendants Crane, Gil-Blanco, Doran, Miriani and Stephens, proceeded past Serrano and Whitehouse, into the house with their firearms drawn. Mayoral discovered Plaintiff Adolfo Mendoza in the kitchen. Adolfo was wearing a shirt but no pants.[2] Mayoral testified that he pointed his weapon at Adolfo and told him to get on the ground. Adolfo complied and Mayoral continued to point his gun at him until the rest of the team secured the house. At that time, Mayoral had somebody else watch Adolfo while Mayoral went to get him a pair of

---

[2]Adolfo testified that he was not wearing any clothes.

**United States District Court**
For the Northern District of California

pants.   After Adolfo put on the pants, Mayoral handcuffed him and directed him to go to the living room.

In the meantime, Doran and Stephens entered a bedroom occupied by Rene Paredes and Plaintiff Jhonny Mendoza.   The parties' versions of what occurred in Paredes and Mendoza's bedroom vary widely.   Defendants contend that Jhonny resisted when Stephens attempted to handcuff him.   Plaintiffs contend that, unprovoked, Stephens hit Jhonny with a gun when Jhonny was trying to open the door to let the officers in.   Eventually Doran handcuffed Paredes and, with the assistance of Crane, Stephens handcuffed Jhonny. Jhonny sustained an eye injury.   The officers brought Paredes and Jhonny to the living room as well.

Reposa entered bedrooms in the rear of the house occupied by Plaintiff Azucena Mendoza and the three juvenile Plaintiffs. Reposa testified that he had his weapon out when he entered the room, but when he could see that the rear bedrooms were otherwise unoccupied, he reholstered the gun.   Reposa brought Azucena and the children to the living room where Adolfo, Paredes and Jhonny were lying on the ground in handcuffs.

According to Defendants, the house was secured within several minutes and the majority of the officers holstered their weapons. See, e.g., Whitehouse Depo. at 84.   Whitehouse testified,

> At one point I was contacted by one of the officers who was watching a rear perimeter position who indicated that when we were making entry, a black male adult and a small black female as well as a pit bull puppy had run out of the backyard or had run out of . . . the house directly to the south [53 DiMaggio]. And at that point, I -- that didn't -- have any significance for me.

11

Whitehouse Depo. at 84-85.  However, four to five minutes after the house was secured, Wood told Whitehouse that Higgins' companion had earlier told the officers that "she had been with Higgins and they had purchased drugs from a black male and he had his black female daughter and a pit bull puppy at the residence."  <u>Id.</u> at 85.  After learning this information, Whitehouse "walked to the front of the house to the sidewalk and . . . peered around the shrubs that had grown between the two residences and . . . saw for sure that [the officers] were in the wrong house."  <u>Id.</u> at 85-86.  Whitehouse testified that once he realized they were in the wrong home, he "immediately contacted [his] supervisors" whom he identified as "Sergeant Wood and Sergeant Mayoral."  Whitehouse Depo. at 86.

Whitehouse returned to the Pittsburgh Police Department to obtain a warrant for 53 DiMaggio, several officers went to secure 53 DiMaggio and Mayoral remained at 41 DiMaggio, talking to Plaintiffs on and off for about forty-five minutes to one hour.  Defendants assert that Wood, Gil-Blanco and Serrano assisted Mayoral at various times.

In contrast, Plaintiffs assert that they were detained in the living room, with Adolfo, Jhonny and Paredes in handcuffs, for approximately fifty minutes before Adolfo overheard Mayoral state that there had been a mistake.  Plaintiffs assert that the officers guarding them had guns in their hands.

Plaintiffs assert 42 U.S.C. § 1983 claims against all Defendants for violation of their Fourth Amendment right to be free from unreasonable search and seizure and from the use of excessive

12

force.[3]  In addition, Plaintiffs assert a § 1983 claim against
Defendants Doran and Wood for supervisory liability.  In an order
entered on January 25, 2008, the Court denied Defendants Gil-
Blanco, Serrano, Stephens and Reposa's motions to dismiss on the
basis of qualified immunity.

<div align="center">LEGAL STANDARD</div>

Summary judgment is properly granted when no genuine and
disputed issues of material fact remain, and when, viewing the
evidence most favorably to the non-moving party, the movant is
clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.
1987).

The moving party bears the burden of showing that there is no
material factual dispute.  Therefore, the court must regard as true
the opposing party's evidence, if it is supported by affidavits or
other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,
815 F.2d at 1289.  The court must draw all reasonable inferences in
favor of the party against whom summary judgment is sought.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d
1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment
are those which, under applicable substantive law, may affect the

---

[3]It appears that the parties agree that the excessive force
claim is brought by Jhonny against Stephens based on the injuries
he sustained.

<div align="left" style="margin-left:6em; font-weight:bold;">United States District Court<br>For the Northern District of California</div>

United States District Court
For the Northern District of California

outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

<div align="center">DISCUSSION</div>

I.   Qualified Immunity

The defense of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The rule of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  A defendant may have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation.  <u>Id.</u>  "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful."  <u>Romero v. Kitsap County</u>, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a defendant is entitled to qualified immunity, the court must engage in the following inquiries.  At the outset, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right.  <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999).  In other words, the court must ask, "Taken in the light most favorable to the party asserting the

United States District Court
For the Northern District of California

injury, do the facts alleged show the officer's conduct violated a constitutional right?" Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Saucier, 533 U.S. at 201.  If this inquiry yields a positive answer, then the court proceeds to determine if the right was "clearly established."  Id.

The inquiry as to whether the right at issue was clearly established must be made in light of the specific context of the case, not as a broad general proposition.  Saucier, 533 U.S. at 202.  "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).  As the Supreme Court has explained, "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  Id. at 753.  The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct.  Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).

If the law is determined to be clearly established, the next question is whether, under that law, a reasonable official could have believed his or her conduct was lawful in the situation confronted.  Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir. 1993).  If the law did not put the officer on notice that his or her conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Saucier, 533 U.S. at 202. Therefore, qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient,

reasonably misapprehends the law governing the circumstances he or she confronted.  Id. at 206.  The defendant bears the burden of establishing that his or her actions were reasonable, even though he or she violated the plaintiff's constitutional rights.  Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995); Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995); Maraziti, 953 F.2d at 523.

Although the Court denied the earlier motion to dismiss on the basis of qualified immunity, moving Defendants now argue that they are entitled to summary judgment because their entry into Plaintiffs' home was based on an "objectively understandable" mistake that does not violate the Fourth Amendment.  Maryland v. Garrison, 480 U.S. 79, 88 (1987).  The Court's denial of the motion to dismiss was based on Plaintiffs' allegations that the officers "knew or should have known that Plaintiffs' residence was not the residence described in the warrant."  January 25, 2008 Order at 8. Moving Defendants assert that there is no evidence to support these allegations.

Moreover, moving Defendants argue that, even if there was a constitutional violation, they are entitled to qualified immunity because Plaintiffs cannot demonstrate that moving Defendants' conduct was "so egregious that any reasonable person would have recognized a constitutional violation."  Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994).  In Ramirez v. Butte-Silver Bow County, the Ninth Circuit held,

> What's reasonable for a particular officer depends on his role in the search.  Because searches often require cooperation and division of labor, officers'

16

United States District Court
For the Northern District of California

> roles can vary widely.  Typically, only one or a few
> officers plan and lead a search, but more -- perhaps
> many more -- help execute it.  The officers who lead
> the team that executes a warrant are responsible for
> ensuring that they have lawful authority for their
> action.

298 F.3d 1022, 1027 (9th Cir. 2002) (internal quotation marks and
alterations omitted).  In Ramirez, the lead officer erroneously
failed to include in the warrant a description of the place to be
searched or the objects sought or to attach to the warrant an
affidavit including this information.  The Ninth Circuit held that
the lead officer was responsible for ensuring that the warrant he
had obtained actually contained this information and, therefore,
the lead officer was not entitled to qualified immunity for
conducting a search without a valid warrant.  However, the court
held that the

> line officers here acted reasonably: They were told
> that a warrant had been obtained and learned through an
> advanced briefing what items could be seized.  Because
> they were not required to read the warrant, the line
> officers conducting this search cannot reasonably have
> been expected to know that it was defective.

Id. at 1028.

Moving Defendants in this case argue that, like the line
officers in Ramirez, they were entitled to rely on the briefing at
which they were told that they would be executing a warrant
authorizing them to search 41 DiMaggio Avenue and, therefore, they
are entitled to qualified immunity.  Plaintiffs counter that it was
unreasonable for moving Defendants to believe that the house they
entered was the house described in the warrant.  In addition,
Plaintiffs contend that Defendants did not give adequate knock-and-
announce notice before entering the home and, once Defendants

17

**United States District Court**
For the Northern District of California

discovered that they were in the wrong home, unreasonably detained Plaintiffs in handcuffs at gunpoint.

As stated above, the Court must first determine whether, if the facts are as Plaintiffs allege, moving Defendants committed a constitutional violation; if so, the Court must turn to the question of qualified immunity.  <u>Saucier</u>, 533 U.S. at 201.

A.   Differences between the house described in the warrant and 41 DiMaggio

Moving Defendants have presented evidence demonstrating that there was no written description of the residence to be searched available to them prior to the search.  Although moving Defendants were given an oral description of the property to be searched, both the house described in the warrant and the house actually searched can fairly be described as one story stucco houses, with raised brick porches.  <u>See</u> Whitehouse Depo. Ex. A.  The major differences between the house described in the warrant and Plaintiffs' house are the absence of the cloth-covered car in the driveway, the U-Haul truck parked in front, the color of the trim and the color of the brick porch.  However, the house described in the warrant and the house searched were both identified as 41 DiMaggio Avenue.

The Court finds that triable questions of fact remain with respect to whether moving Defendants did commit a constitutional violation by entering and searching Plaintiffs' home.  In particular, the evidence suggests that Defendants could have seen that the U-Haul truck was not parked in front of the house they entered and cloth-covered car was not parked in the driveway.

The Court next turns to the question of qualified immunity.

18

United States District Court
For the Northern District of California

Moving Defendants rely primarily on Ramirez to support their argument that, as line officers, they are entitled to qualified immunity.   As Plaintiffs point out, Ramirez is distinguishable because the line officers in that case searched the property actually described in the warrant and were not aware that the warrant was faulty.   In this case, moving Defendants could not have entered the home described in the warrant because it did not exist. By entering 41 DiMaggio, they entered the house with the proper house number but the incorrect physical description.   If they had entered the house with the correct physical description, it would have had the incorrect house number.

Nonetheless, the Court finds that it was reasonable for moving Defendants to follow Whitehouse to the house to be searched. Moving Defendants have presented undisputed evidence that, after gathering around the corner from 41 DiMaggio, they followed Whitehouse in single file to the residence to be searched.   As described above, Whitehouse had provided the description of the house during the briefing.   Moreover, moving Defendants were aware that Whitehouse had seen the house and written the description upon which the warrant was based.   As several Defendants testified, their primary concern when following Whitehouse was their safety. For example, when asked what he was thinking about as they approached the house, Stephens responded, "I recall thinking about let's hurry up and get past all the windows so I don't get shot at."   Stephens Depo. at 28.

19

United States District Court
For the Northern District of California

Moreover, it is undisputed that only two of the moving Defendants, Gil-Blanco and Reposa, had even been on DiMaggio Avenue on the night of the search prior to the execution of the faulty warrant.  Although Gil-Blanco and Reposa had driven down DiMaggio Avenue with Wood and Whitehouse, respectively, as passengers, nothing in any of the evidence presented establishes that Gil-Blanco or Reposa gained any knowledge while on DiMaggio that would make it unreasonable for them to rely upon Whitehouse's representation that they were entering the correct house.

At the time moving Defendants followed Whitehouse to Plaintiffs' house, they had Whitehouse's description of the house, including the house number, which matched the house they entered, and Whitehouse's indication that they should follow him.  The Court finds that moving Defendants' lack of personal knowledge of the house to be searched, together Whitehouse's possession of such knowledge, made it reasonable for them to rely upon his instructions.  The Court grants moving Defendants' motion for summary judgment to the extent it is based on Defendants' entry into Plaintiffs' home.

B.   Knock-and-announce

Plaintiffs further contend that summary judgment is inappropriate because moving Defendants acted unreasonably by failing to give adequate knock-and-announce notice before entering the house.  The Fourth Amendment requires that law enforcement officers ordinarily give notice of their authority and purpose before making an entry of premises for purposes of a search or to arrest a person therein.  See Wilson v. Arkansas, 514 U.S. 927, 934

(1995) (knock-and-announce principle is part of Fourth Amendment reasonableness inquiry).  Thus, the law requires that "officers entering a dwelling pursuant to a search warrant announce their purpose and authority and either wait a reasonable amount of time or be refused admittance before forcibly entering the residence. This knock and announce requirement may be excused, however, by the presence of exigent circumstances." United States v. Bynum, 362 F.3d 574, 579 (9th Cir. 2004) (citations omitted).

Moving Defendants have produced testimony that the officers announced, "Police.  Search warrant.  Demand entry," three times in English and in Spanish before using the battering ram to open the door.  See, e.g., Mayoral Depo. at 49.  In addition, Mayoral testified that he determined the amount of time to wait between the announcements and breaching the door by assessing "the size of the house [and] time of night." Id.  Because there were no lights on, the house was small and it was the middle of the night, Mayoral assessed that a reasonable time would be one or two minutes. Id.

Plaintiffs counter that Wood wrote in his report that "[a]fter several seconds the front door was breached and officers entered the residence." Wood Depo. at 66.  Moreover, Adolfo testified that within four to five seconds after he heard the banging on the door, the officers broke down the door.  Mendoza Depo. at 44-46.  Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that there is a triable question of fact with respect to the adequacy of the knock-and-announce notice given before Defendants entered Plaintiffs' home.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

However, it appears that Mayoral or Wood, not one of the moving Defendants, made the decision to breach the door.  See, e.g., Whitehouse Depo. at 78 (Wood made decision); Serrano Depo. at 30 (Mayoral made decision); Mayoral Depo. at 51 (Wood made decision).  Just as moving Defendants were reasonable in relying upon Whitehouse's identification of the proper house to search, Serrano was reasonable in relying on his supervisor's decision that sufficient notice had been given to justify an order to force open the door.  Once that had occurred, it was reasonable for the other officers to follow into the house.

C.   Detention of Plaintiffs

Finally, Plaintiffs contend that moving Defendants acted unreasonably when they did not holster their guns and kept Plaintiffs in handcuffs after they had assembled Plaintiffs in the living room.  Plaintiffs assert that, despite Defendants' claim that they knew they had made a mistake within minutes, they kept Plaintiffs handcuffed and guarded by individuals carrying guns for close to fifty minutes.  However, at the hearing, counsel for Plaintiffs conceded that there is no evidence to establish that any moving Defendant was involved in the alleged ongoing detention.  Therefore, the Court grants summary judgment in moving Defendants' favor to the extent Plaintiffs' Fourth Amendment claim is based on their detention in the living room.

II.   Supervisory Liability

A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or

22

United States District Court
For the Northern District of California

1    (2) a sufficient causal connection between the supervisor's

2    wrongful conduct and the constitutional violation.  Redman v.

3    County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

4    A supervisor therefore generally "is only liable for constitutional

5    violations of his subordinates if the supervisor participated in or

6    directed the violations, or knew of the violations and failed to

7    act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th

8    Cir. 1989).  An administrator may be liable for deliberate

9    indifference to a serious medical need, for instance, if he or she

10   fails to respond to a prisoner's request for help.  Jett v. Penner,

11   439 F.3d 1091, 1098 (9th Cir. 2006).  "'Supervisory liability is

12   imposed against a supervisory official in his individual capacity

13   for his own culpable action or inaction in the training,

14   supervision, or control of his subordinates, for his acquiescence

15   in the constitutional deprivations of which the complaint is made,

16   or for conduct that showed a reckless or callous indifference to

17   the rights of others.'"  Preschooler II v. Davis, 479 F.3d 1175,

18   1183 (9th Cir. 2007) (citations omitted).

19       Moving Defendants argue that Plaintiffs have failed to

20   establish that Doran has any supervisory culpability for

21   Defendants' actions.  Plaintiffs counter that "Doran allowed the

22   officers under his command to forcibly enter Plaintiffs' home."

23   Opposition at 12.  Further, Plaintiffs contend, "If the team had

24   followed the proper police procedures and relied on the legal

25   description of the location to be searched, they would have gone to

26   the correct location." Id.  However, Plaintiffs have not come

27

28                                    23

forth with any evidence to demonstrate that, at the time the
officers arrived at 41 DiMaggio, Doran was acting as anything but a
line officer.   Plaintiffs also suggest that Doran failed to respond
after Jhonny's eye was cut.   However, Doran's actions after Jhonny
was injured cannot be said to have caused that injury.

The Court grants summary judgment to Doran on Plaintiffs'
supervisory liability claim.

III.  Excessive Force

In a separate motion, Defendant Stephens argues that he is
entitled to qualified immunity with respect to Jhonny's excessive
force claim against him.   However, Plaintiffs' and Defendants'
versions of the altercation between Jhonny and Stephens vary
widely.   According to Paredes, Jhonny was attempting to open their
bedroom door when the officers burst in and struck Jhonny in the
face, with what Parades believes was a gun.   Parades Depo. at 48,
51.   Although Defendants' expert opined that Stephens' use of force
was reasonable given the circumstances, that opinion was based on
Stephens' account of what happened.   Similarly, Plaintiffs' expert
opined, "If the version given by the plaintiffs is correct the
force used against [Jhonny] would be objectively unreasonable."
Rooney Decl., Ex. D. at 8.

Stephens' motion for summary judgment is denied.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants Crane,
Serrano, Gil-Blanco, Doran, Miriani, Reposa and Stephens' motion
for summary judgment (Docket No. 99) and DENIES Defendant Stephens'

United States District Court
For the Northern District of California

1  separate motion for partial summary judgment (Docket No. 97).[4]

2      IT IS SO ORDERED.

3

4  Dated: 8/21/08
                                  _____

5                                      CLAUDIA WILKEN
                                    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26      [4]Defendants' objection to evidence submitted by Plaintiffs is
overruled as moot.  The Court did not consider any improper or
27  inadmissible evidence in deciding these motions.

28                          25